**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
SUSAN GREEN, Executrix of the Estate of      :
WALTER GREEN, deceased,                      :
                                             :       01 Civ. 1996 (RMB)
                              Plaintiff,      :
                                             :       **DECISION AND ORDER**
              -against-                       :
                                             :
CITY OF NEW YORK and PAUL GIBLIN,             :
                                             :
                              Defendants.     :
-------------------------------------------------------------x

I.      **Background**

        This litigation involves the difficult and tense events of March 19, 2000, which transpired

after the 14-year-old daughter and the (medically untrained) home aide of Walter Green

summoned "911" emergency responders employed by the City of New York to Mr. Green's

Upper West Side Manhattan penthouse apartment for help.  (See Alixandra Green Trial

Testimony, July 10, 2007 ("A. Green Tr."), at 282:14-15, 236:3-5.)  Mr. Green, who at the time

suffered from advanced Amyotrophic Lateral Sclerosis (also known as ALS or Lou Gehrig's

disease), was substantially paralyzed, was confined to a wheelchair to which a mechanical

respirator (ventilator) was attached, and was unable to use his voice to speak (see William Hill

Trial Testimony, July 9, 2007 ("Hill Tr."), at 29:2-3, 51:5-10), had fallen unconscious and was

unable to breathe because both of his mechanical respirators had failed.  (See A. Green Tr. at

233:3-6.)  This life-threatening situation was further complicated by the fact that Mr. Green (it

was later determined in the hospital emergency room) was also suffering from pneumonia and

his air passages were filling with large amounts of yellow-green mucous.  (See Susan Green

Trial Testimony, July 12, 2007 ("S. Green Tr."), at 716:19-25; Dr. Tiffany Reiser Deposition

Testimony, read at trial July 12-13, 2007 ("Reiser Tr."), at 872:16.)  Mr. Green

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/6/07

(understandably) frightened daughter told the 911 operator that her father was "dying" and "we need help!" (Pl. Ex. 27 at 3-4; see A. Green Tr. at 293:17-24, 294:19-24.)

Within minutes, New York City police officers, firemen (along with a hook and ladder truck), two fire department emergency medical technicians ("EMTs"), and two paramedics from St. Luke's Roosevelt Hospital, arrived at the Green home. (See Pl. Ex. 11 at 1.) Once there, however, they were presented with an extraordinarily difficult and unusual problem – in an atmosphere which a lawyer friend of the Green family who had also been summoned to the scene would describe at trial as "chaos" and "pandemonium." (Joan Bertin Trial Testimony, July 9-10, 2007 ("Bertin Tr."), at 132:17-20.) That is, Mr. Green's wife, Susan, had arrived home a few minutes before the City responders got there and she and her daughter were able to provide air to Mr. Green by using a hand-operated plastic bellows-type device called an "ambu-bag" (which they attached to his tracheostomy) and by suctioning "a huge plug" of mucous from Mr. Green's lungs. (A. Green Tr. at 238:7-11, 22-23.) And, after inviting the 911 responders into the apartment to help care for Mr. Green, Susan Green told the responders, "I really appreciate it but we don't need you anymore," that the Green family could handle the situation at home, that Mr. Green (who communicated by eye blinks and by computer) did not want to go to the hospital, and that a respirator repairman, who was summoned from Suffolk County but had not yet arrived, was on the way.[1] (S. Green Tr. at 710:5-8, 711:23-25, 723:19-20; see Hill Tr. at 53:12-13, 55:20-56:10.) The Green family did not produce to the City responders any document reflecting Mr. Green's medical wishes or the authority of a family member to make medical

---

[1]     Mrs. Green's lack of a sense of urgency was explained at trial as follows: "No, I did not think this was really an emergency . . . Walter had died once before . . . and he came back." (S. Green Tr. at 736:2-4 (emphasis added).)

decisions on his behalf.  (See Walter Green Deposition Testimony, read at trial July 11-12, 2007

("W. Green Tr."), at 759:5-16; S. Green Tr. at 695:2-4.)[2]

    While in the Green apartment (during the first 30 minutes), one of the paramedics called

"Telemetry," a City-run telephone service staffed by medical professionals who assist 911

responders in the field dealing with unusual situations.  (See Pl. Ex. 27 at 21.)  The paramedic

advised Telemetry of the circumstances at the Green apartment, including Mr. Green's medical

history of ALS, his inability to use his voice to speak, the failed respirators, and the facts that he

had been unconscious, was being "bagged" or breathed for manually via ambu-bag, was "septic,

and had "100 cc's of yellow green mucous" suctioned "out of his lungs."  (Pl. Ex. 27 at 21-22.)

Telemetry did not offer an opinion about how to deal with Mr. Green but rather determined that a

supervisor immediately should be sent to the Green apartment to observe the situation and to

suggest an appropriate outcome, i.e., acceptance of a refusal of medical attention or transport to a

hospital.  (See Dr. Flavio Crisari Trial Testimony, July 10, 2007 ("Crisari Tr."), at 320:4-7; see

Pl. Ex. 27 at 24 ("standby for the lieutenant and see what he can . . . get done from there").)

Thereupon, Defendant Lieutenant Paul Giblin was directed to the Green apartment.  (See Pl. Ex.

11 at 1-2.)

    Upon arriving at the Green apartment at approximately 3:33 p.m., Lieutenant Giblin

conferred with the paramedics on scene.  (See Paul Giblin Trial Testimony, July 10-11, 2007

("Giblin Tr."), at 364:2-4, 368:8-11.)  He learned from the paramedics that Mr. Green had been

unconscious shortly before the first responders arrived (see Pl. Ex. 12, 13), that there was no

working mechanical respirator in the apartment (see S. Green Tr. at 704:17-18), and that Mr.

Green was suffering from a respiratory infection of some sort and had a large amount of yellow-

---

[2]      Plaintiff argued at trial that Mr. Green communicated by blinking in response to yes or no
questions (one blink for "no," two blinks for "yes") and by typing with one finger on his
computer, "I fine no hosp."  (A. Green Tr. at 239:3-5, 244:5-6.)

green mucous in his lungs.  (See S. Green Tr. at 716:19-25.)  Lieutenant Giblin was told that a

respirator repairman had been called but had not arrived.  (See A. Green Tr. at 253:22-254:6.)

When Lieutenant Giblin determined (with the unanimous support of the paramedics on scene)

that the medically prudent course of action was to transport Mr. Green to St. Luke's for

evaluation and treatment – and not, as Mrs. Green had requested, to leave Mr. Green behind in

these circumstances (see C.K. Collins Trial Testimony, July 11, 2007 ("Collins Tr."), at 825:2-

4), the Green family became uncooperative and, thereafter, physically confrontational.  (See S.

Green Tr. at 723:16-19.)  Mrs. Green kicked and injured one of the EMS workers (who later

successfully sued Mrs. Green in state court for damages) (see S. Green Tr. at 725:2-6, 726:9-14);

Mr. Green's daughter, Alixandra, at her mother's direction, "barricaded [the] front door with all

the furniture that [she] could find" so the City responders could not leave with her father (A.

Green Tr. at 254:12-15); and Joan Bertin, the family friend who is also a lawyer, had a

"screaming" and "cursing" verbal confrontation with police officers on the scene (Bertin Tr. at

158:14-15 (telling them at one point "this is fucking outrageous")) and when she lost the

argument, Ms. Bertin called a relative who was a director at NBC news and requested that NBC

immediately send a news team to the Green home.  (See Bertin Tr. at 155:9-14, 158:2-15,

208:12-25.)

　　　　After remaining at the Green apartment for approximately ninety minutes (and still no

respirator repairman having arrived), the City responders removed Mr. Green over Mrs. Green's

objection (see Pl. Ex. 11 at 2) and transported him to the emergency room at St. Luke's

Roosevelt Hospital ("St. Luke's"), the closest 911 receiving hospital.  (See Captain Brian

Milzoff Trial Testimony, July 10, 2007 ("Milzoff Tr."), at 358:6-9.)  Mr. Green was evaluated at

St. Luke's emergency room and received pure oxygen for several hours.  (See Reiser Tr. at

865:14-16, 891:5-13; Def. Ex. C.)  And, despite Mrs. Green's earlier protests against any

hospitalization and further treatment, Mr. Green was, immediately thereafter, admitted to St. Luke's with his consent.  (See Reiser Tr. at 866:6-13 ("I explained to him that I thought he needed to be admitted to the hospital . . . [a]nd using yes and no questions I asked him whether he thought it was reasonable that I admit him into the hospital, and he agreed").)  In fact, Mr. Green was, with his consent, treated successfully for, among other things, pneumonia (with antibiotics) for a total of seven days, first in the Medical Intensive Care Unit at St. Luke's and then at Columbia Presbyterian Hospital.  (See Def. Ex. C, D at A394.)

Dr. Anthony Mustalish, a medical doctor with expertise in emergency medicine who was called by the defense at trial as an expert witness – and whose expert opinion was never challenged by an expert for Plaintiff – opined "with a reasonable degree of medical certainty" that Walter Green "needed to be transported to a hospital emergency department for further evaluation and treatment" on March 19, 2000 and, if the responders had left Mr. Green behind in his apartment, "more likely than not he would have died."  (Dr. Anthony Mustalish Trial Testimony, July 12, 2007 ("Mustalish Tr."), at 667:9-17.)

**Prior Proceedings**

Walter Green ("Plaintiff") along with Susan and Alixandra Green filed a complaint with the Court against the City of New York ("City") and Lieutenant Giblin (collectively, "Defendants") on or about March 8, 2001, arguing, among other things, that Defendants "discriminated against plaintiff Walter Green by failing to heed his expressly stated and competently given wishes regarding his own care and treatment solely because he suffers from a disability which renders him incapable of unassisted verbal speech, violated the civil rights of plaintiff Walter Green, unlawfully assaulted plaintiff[] and forcibly removed Walter Green from his home against his clearly stated desires causing plaintiff[] to suffer serious injuries," including body "sores" and "emotional injuries."  (See Amended Complaint dated July 10, 2001, at 1-2,

14, 19.)  On February 3, 2004, prior to trial, the Court dismissed all claims against Lieutenant

Giblin and the City of New York, by adopting the report and recommendation ("Report") of

Magistrate Judge Gabriel W. Gorenstein, dated January 5, 2004, which recommended that the

Court grant the Defendants' motion for summary judgment.  Judge Gorenstein had found, among

other things, that none of the City officials or employees had "acted unreasonably . . . in bringing

Mr. Green to a hospital where his condition could be properly treated and stabilized," that

Lieutenant Giblin was entitled to qualified immunity, and that, in any event, "the decision to treat

Mr. Green was not based on his inability to talk but rather was based on Giblin's perception that

Walter Green 'was in extremis,' and he needed to go to the hospital because he could not breathe

for himself."  (Report at 16, 22.)  The Court accepted Judge Gorenstein's findings and

recommendations.  (See Order dated Feb. 3, 2004 ("the evidence presented by Plaintiffs is

insufficient, as a matter of law, to permit the action to continue and to support Plaintiffs' claim

that Walter Green was discriminated against").)  On appeal, the United States Court of Appeals

for the Second Circuit upheld the Court's decision in part and vacated and remanded with respect

to Walter Green's claims under the Americans with Disabilities Act ("ADA"), the New York

State Human Rights Law ("HRL"), the Fourth Amendment to the U.S. Constitution, and New

York State assault and battery laws.  See Green v. City of New York, 465 F.3d 65, 78, 84 (2d

Cir. 2006) ("the evidence in this case could support a jury finding that [Lieutenant] Giblin

perceived Walter [Green] as incompetent because of Walter's extreme physical disability and

therefore denied him the right to use the City's evaluation system" for refusals of medical

assistance, and "we conclude there are factual issues relevant to qualified immunity").[3]

_____

[3]        The Court of Appeals upheld the dismissal of all claims brought by Susan Green.  See
Green, 465 F.3d at 86.  Defendants subsequently filed a motion to dismiss the assault and battery
claims brought by Alixandra Green under New York State law.  (See Defendants' Motions in

The Court conducted a five-day jury trial, from July 9 through 13, 2007, of Mr. Green's claims of discrimination under the ADA and HRL, unlawful seizure and excessive force under the Fourth Amendment to the U.S. Constitution, and assault and battery under New York State law.  At the close of Plaintiff's case, and again at the close of all evidence, Defendants moved for a judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 50(a) ("Rule 50(a)"), arguing that "there is no legally sufficient evidentiary basis for the jury . . . to find for the plaintiff in this case."  (Trial Tr. at 621:21-24.)  Following both applications, the Court reserved decision.  (See Fed. R. Civ. P. 50(b); Trial Tr. at 624:21-25, 908:6-8.)  With de minimus exceptions, both sides agreed to the Court's jury charges.  (See Trial Tr. at 881:1-25.)[4] The parties also agreed to the verdict sheet which contained the following special interrogatory: "**Was retired Lieutenant Paul Giblin's decision to remove Walter Green from his home on March 19, 2000 reasonable**?"  (Court Ex. E at Question 3.)[5]

The jury responded "**Yes**" to this interrogatory about the reasonableness of Lieutenant Giblin's decision to remove Mr. Green from his home on March 19, 2000.  (See Court Ex. J at Question 3.)[6]  The jury also determined that, in removing Mr. Green from his apartment, Lieutenant Giblin did not use excessive force under the Fourth Amendment to the U.S. Constitution, (see Court Ex. J at Question 1(b)), and that Lieutenant Giblin did not effect an unlawful seizure of Mr. Green under the Fourth Amendment to the U.S. Constitution.  (See

---

limine dated May 29, 2007.)  The Court granted Defendants' motion on July 6, 2007.  (See Order dated July 6, 2007.)

[4]      (See also Transcript of Oral Argument, Sept. 4, 2007 ("Oral Argument Tr.").)

[5]      (See Trial Tr. at 882:1-2 ("Defendants are in agreement with . . . the verdict sheet"), 882:21-22 ("[t]he verdict sheet is acceptable to [P]laintiffs").)

[6]      Among the implications of the jury's "yes" response, is that Lieutenant Giblin is entitled to qualified immunity.  See Green, 465 F.3d at 83; Papineau v. Parmley, 465 F.3d 46, 63 (2d Cir. 2006).

Court Ex. J at Question 1(a).)  And, the jury determined that the City did not commit an assault

or battery under New York State law by removing Mr. Green.  (See Court Ex. J at Question 6, 7.)

At the same time, the jury determined that the City violated Mr. Green's rights under the

ADA, and that the City and Lieutenant Giblin violated Mr. Green's rights under the HRL (see

Court Ex. J at Question 2, 4, 5), and the jury awarded Mrs. Green, as executrix of Walter Green's

estate, $400,000 in compensatory damages.  (See Court Ex. J at Question 9.)

### Post-Trial Motions

On or about July 27, 2007, the City filed a (renewed) motion for judgment as a matter of

law pursuant to Fed. R. Civ. P. 50(b) ("Rule 50(b)"), arguing that "there is no legally sufficient

evidentiary basis to find for [P]laintiff" on the ADA or HRL claims.  (Def. Mem. at 2.)  The City

argues that Plaintiff failed to prove his ADA claim because he did not establish that "his

disability . . . was the determining factor in the decision to transport him to a hospital," or that

"he suffered damages as a result" (Def. Mem. at 7, 8); and Plaintiff failed to establish that "the

HRL applies to the facts in this case," that "he was denied services because of his disability," or

that "he suffered damages as a result."  (Def. Mem. at 10, 14.)  In the alternative, the City argues

that the Court should "order a new trial pursuant to [Fed. R. Civ. P.] 59" ("Rule 59") on the

ADA and HRL claims "or significantly reduce the damages award pursuant to Rule 59" because

"[t]he exceedingly high award makes the jury's decision suspect . . . ."  (Def. Mem. at 1-2, 17.)

On or about August 24, 2007, Plaintiff opposed the City's Rule 50(b) and 59 motions,

arguing that "[D]efendants' conduct in failing to afford Walter [Green] the right to control his

body and fate enjoyed by non-disabled persons constituted discrimination."  (Pl. Mem. at 2.)

Plaintiff argues that "this court is constrained by the holding of the Court of Appeals for the

Second Circuit which has effectively already affirmed the jury's finding that defendants violated

the [ADA] and [HRL]" and "this court cannot properly grant judgment as a matter of law on the

basis of trial evidence that is not substantially different than that presented on summary

judgment." (Pl. Mem. at 1-2.)[7]  Plaintiff also argues that "there is not a scintilla of evidence in

support of [the City's] argument" that Plaintiff's "physical injuries (the sores) were not caused

by defendants' conduct" and "[t]he jury's compensatory damages award of $400,000 for

Walter's physical and emotional injuries was reasonable and fair."  (Pl. Mem. at 9-10.)

On or about August 30, 2007, the City filed a reply.  (See Reply, dated Aug. 30, 2007, at

3-4 ("the evidence adduced at trial was significantly different from that produced in the summary

judgment motion" and "[P]laintiff completely failed to refute [in opposition to the City's 50(b)

motion] that there was no evidence adduced at trial illustrating Walter Green was treated

differently than any similarly-situated non-disabled person").)

On September 4, 2007, the Court heard oral argument.  (See Oral Argument Tr.)

The Court, for the reasons set forth below, concludes that, pursuant to Rule 50(b),

judgment in favor of the City is appropriate with respect to the ADA and HRL claims.  See Fed.

R. Civ. P. 50(b).  Indeed, if ever there were a case which warranted granting a Rule 50(b) motion

and reversing a jury determination of liability (and damages), this is that case.  The decision to

remove Mr. Green for hospital evaluation and treatment was, as the jury concluded, "reasonable"

and there was no legally or factually sufficient basis, viewing the evidence in the light most

favorable to Plaintiff and deferring to credibility determinations and reasonable inferences of the

jury, for a reasonable jury to conclude that the City's actions (including those of Lieutenant

Giblin) violated the ADA or HRL.  Specifically, the Court concludes, viewing the evidence in

the light most favorable to Plaintiff, that (i) there was no discrimination by the City responders

_____

[7]      The Court respectfully disputes, among other things, Plaintiff's contention that the U.S.
Court of Appeals for the Second Circuit has "already affirmed the jury's finding that defendants
violated the [ADA] and [HRL]."  The Court believes this Decision and Order is thoroughly
consistent with Second Circuit precedent, including, e.g., Olivier v. Robert L. Yeager Mental
Health Ctr., 398 F.3d 183, 190 (2d Cir. 2005) and Green, 465 F.3d at 78.

because their decision to remove Mr. Green was medically driven; (ii) the decision to remove Mr. Green was reasonable (as the jury determined) and not discriminatory because the unrebutted expert testimony at trial showed that Mr. Green lacked the decisional capacity to determine the appropriate course of his treatment while at his home; and (iii) there was no discrimination by Telemetry officials whose decision was (simply) to send a supervisor to the Green home further to evaluate the circumstances.[8] And, (iv) Mr. Green's alleged injuries (sores) were not caused by Lieutenant Giblin's (reasonable) decision to remove Mr. Green for evaluation and treatment at St. Luke's.

While it is natural to have empathy for Mr. Green (who passed away from his terminal disease some 19 months after the incident on March 19, 2000) and his family, the unrebutted evidence and applicable law compels the Court to set aside that portion of the jury's verdict which determined that Mr. Green was discriminated against by Defendants.

**For the reasons set forth below, Defendant's motion for a judgment as a matter of law pursuant to Rule 50(b) is granted.**

## II.      Legal Standard

### Rule 50(b)

Rule 50(b) "permits a party to 'renew' an earlier request for judgment as a matter of law [under Rule 50(a)] by filing a motion no later than 10 days after entry of judgment." Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005). A court may grant a judgment under Rule 50(b) if "the evidence, viewed in the light most favorable to the opposing party, is

---

[8]      As noted at pp. 4-5, supra, **after** Mr. Green had been placed on a mechanical respirator, treated with 100% oxygen for several hours and evaluated (see Reiser Tr. at 891:5-13) at St. Luke's, he consented to two days of hospitalization at St. Luke's and five additional days of hospitalization and treatment at Columbia Presbyterian Hospital (see Reiser Tr. at 866:6-13; Def. Ex. C, D) notwithstanding his family's earlier protests against hospitalization, evaluation and treatment.

insufficient to permit a reasonable juror to find in her favor." <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d Cir. 1998). In granting such a judgment, "the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." <u>Id.</u>

"[A] plaintiff ordinarily must introduce expert testimony to establish the relevant medical standards that were allegedly violated." <u>Olivier</u>, 398 F.3d at 190. "Where [such expert testimony] is not proffered, the defendant is entitled to judgment as a matter of law . . . by means of a judgment notwithstanding a jury verdict in favor of the plaintiff." <u>Sitts v. United States</u>, 811 F.2d 736, 740 (2d Cir. 1987); <u>see also</u> <u>Olivier</u>, 398 F.3d at 191-92.

### Rule 59(a)

"As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice," for instance, "when the jury's verdict is against the weight of the evidence." <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir. 1998). Rule 59(a) "has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 244-45 (2d Cir. 2003) (citations omitted).

### Rule 59(e)

"If a district court finds that a verdict is excessive, . . . under the practice of remittitur, [it] may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." <u>Tingley Sys. v. Norse Sys.</u>, 49 F.3d 93, 96 (2d Cir. 1995). "[T]he size of a jury's verdict may be so excessive as to be inherently indicative of passion or prejudice."

Ramirez v. New York City Off-Track Betting Corp., 112 F.3d 38, 40 (2d Cir. 1997).  Under

federal law, remittitur is appropriate where a jury's award is "so high as to shock the judicial

conscience."  Casey v. Long Island R.R., 406 F.3d 142, 147 (2d Cir. 2005).  Under New York

State law, "jury verdicts may be set aside . . . where the jury's award deviates materially from

what would be reasonable compensation."  Meacham v. Knolls Atomic Power Lab., 381 F.3d 56,

78 (2d Cir. 2004).

## III.    Analysis

The City argues that the Court should find "as a matter of law," under both the ADA and

HRL, that Plaintiff failed to prove that he was denied a "service," i.e., access to the City's

protocol for refusals to accept medical aid, "because of his disability" and that "there was no

evidence put forth by the [P]laintiff that demonstrated that [P]laintiff had [decisional] capacity"

to refuse medical aid.  (Def. Mem. at 5, 7.)  The City also argues that Plaintiff failed to prove

"that he suffered damages as a result" of any denial of services by Defendants.  (Def. Mem. at 8.)

Plaintiff argues that Mr. Green's medical condition "is wholly irrelevant."  (Pl. Mem. at

5.)  Plaintiff contends that, "irrespective of his physical health, he had a right to refuse treatment

if he was competent," that Mr. Green "was alert and oriented at the time he refused further

treatment," and that the "injuries resulting from [Mr. Green's] removal were properly considered

and decided by the jury."  (Pl. Mem. at 5-6, 10.)

### (i)    Medical Basis for Removal

The Court concludes that the evidence (which, among other things, supports the jury's

finding that Mr. Green "reasonably" was removed from his home), viewed in the light most

favorable to Plaintiff and with "deference to all credibility determinations and reasonable

inferences of the jury," Galdieri-Ambrosini, 136 F.3d at 289, was "insufficient to permit a

reasonable jury to find in [his] favor."  Broadnax, 415 F.3d at 268.  Mr. Green was not taken to

St. Luke's emergency room because he had ALS or because he could not speak.  Rather, he was taken to the hospital for evaluation and treatment for sound medical reasons, as follows: Lieutenant Giblin, after conferring with the paramedics on-scene, learned that Mr. Green "had been unconscious when they arrived," that the paramedics had performed "advanced life support" for Mr. Green (Giblin Tr. at 430:22-25), that Mr. Green "had developed a condition of hypoxia or lack of oxygen because he had stopped breathing for a period of time" (Giblin Tr. at 382:10-13), and that Mr. Green was "septic."  (Pl. Ex. 27 at 21.)  Lieutenant Giblin "assess[ed] the situation with the paramedics," recognized that Mr. Green's "ventilators were not working," "he had to be bagged" via ambu-bag in order to breathe, and "there was nobody [in the Greens' apartment] who was a competent medical authority" if the City responders were to leave (and "abandon") Mr. Green behind.  (Giblin Tr. at 434:2-6.)  Lieutenant Giblin understood that Mr. Green had some level of consciousness "but he was not able to make a decision for himself" and "therefore speaking to him would not have done me any good."  (Giblin Tr. at 377:9-10, 435:24-25.)  Lieutenant Giblin's "reasonable" decision was that Mr. Green needed to be transported to St. Luke's for evaluation and treatment and could not be assessed for refusal of medical assistance.[9]  (See Court Ex. J; S. Green Tr. at 716:5-18; Giblin Tr. at 383:12-13.)

In legal terms, there was no discrimination because Plaintiff did not show that Mr. Green was treated differently than "similarly situated persons without disabilities."  Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d Cir. 2003); (see also Court Ex. C. at 17.)[10]  Defendants

---

[9]      Lieutenant Giblin based his decision, in part, upon the medical assessments of Mr. Green by the St. Luke's paramedics at the Green apartment.  (Giblin Tr. at 430:6-10; Collins Tr. at 824:14-21.)

[10]      Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  ADA plaintiffs must demonstrate that "(1) they are 'qualified individuals'

adhered to the Fire Department of the City of New York Guidelines for refusal of medical aid

("Guidelines"), which are "designed to set out standards for . . . evaluations of refusals [of

medical assistance]" (Crisari Tr. at 315:21-316:1), and which state that "pre-hospital care

providers must thoroughly assess all patients, and provide appropriate care . . . prior to

considering the acceptance of a Refusal of Medical Aid (RMA)."  (Pl. Ex. 14 § 4.)  This includes

assessing whether "a mechanism of injury exists," and whether "[a]ny patient [is] in need of

assistance due to physical or incapacitating limitations."  (Pl. Ex. 14 § 4.1.)  Plaintiff's witnesses

confirmed that, among other things, Mr. Green's "mechanism of injury" was the failure of his

mechanical respirators which were his normal source of oxygen (compounded by the yellow-

green mucous in his lungs resulting, it was later determined, from pneumonia), that these

conditions persisted throughout the hour and a half that the 911 responders were present in the

Greens' apartment (see A. Green Tr. at 242:24-243:7), and that the lack of a working respirator

was "a very serious problem" for Mr. Green.  (Hill Tr. at 60:25-61:6.)  Because of his

malfunctioning respirators, among his other conditions, Mr. Green was a "patient in need of

assistance due to physical or incapacitating limitations" (Pl. Ex. 14 § 4.1.5), and he could not

breathe without uninterrupted manual ventilation via ambu-bag and suctioning of mucous.  (See

---

with a disability"; "(2) that the defendants are subject to the ADA"; "(3) that plaintiffs were
denied the opportunity to participate in or benefit from defendants' services, programs, or
activities, or were otherwise discriminated against by defendants, by reason of plaintiffs'
disabilities"; and (4) "the defendant[s'] wrong is also the legal cause of the injury."  Henrietta D.,
331 F.3d at 272, 278; (see also Court Ex. C. at 16.)

Section 296(2)(a) of the HRL forbids an "owner, lessee, proprietor, manager,
superintendent, agent or employee of any place of public accommodation, resort or amusement,
because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or
deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."
N.Y. Exec. Law § 296(2)(a).  HRL plaintiffs must show that they are denied a service "solely
because they have [a] disability," Cahill v. Rosa, 89 N.Y.2d 14, 24, 674 N.E.2d 274, 278 (1996),
and that there exists a "legal connection between the alleged violations and the injuries sustained
by plaintiff."  Warrick v. Capabilities, Inc., 299 A.D.2d 622, 623, 750 N.Y.S.2d 662, 664 (3d
Dep't 2002).

Giblin Tr. at 380:5-6 ("he cannot be left behind without medical personnel there to take care of him").)

And because, among other factors, no respirator repairman had arrived (even after an hour and a half), the reasonable option available to the 911 responders to alleviate Mr. Green's "mechanism of injury" was to transport Mr. Green to the hospital for evaluation and treatment. (See Giblin Tr. at 381:21-22 ("he needed to go to the hospital to be put on a vent[ilator] because there was no working vent[ilator] at his house").)  Lieutenant Giblin and the other responders complied with the Guidelines directive (to "provide appropriate care  . . . prior to considering the acceptance of a Refusal of Medical Aid" (Pl. Ex. 14 § 4.1)), and adhered to "the standards of good and acceptable practice of emergency medicine." (Mustalish Tr. at 672:17-19.)[11]

Given Mr. Green's grave medical condition, the City's actions to help save Mr. Green's life were not discriminatory under the ADA or HRL but, rather, were medically required.  Dr. Mustalish opined that Mr. Green "had a number of conditions which if any one existed would be the basis for transfer [to a hospital]," including the fact that "he could not breathe without a ventilator and both [of Mr. Green's ventilators] were broken and nonworking"; "there are no trained medical personnel to provide the respiratory care on an interim basis"; "he had . . . green mucous, that blocked his airway to cause a respiratory arrest" and "[h]e would have died in a matter – in a very short time if that wasn't clarified."[12] (Mustalish Tr. at 667:17-25); see

---

[11]     The two fire department EMTs helped care for Mr. Green while in his apartment (see Giblin Tr. at 430:6-13) by administering air to Mr. Green with the ambu-bag, to which the Green family did not object.  (See S. Green Tr. at 710:5-711:13.)

[12]     Dr. Mustalish also testified that Mr. Green "sustained an ischemic or anoxic event" in which "many organs were affected" and "[y]ou don't know whether or not the kidneys are going to shut down, whether he will go into heart failure or have some kidney failure from the oxygen – lack of oxygen.  And the full extent of the injury . . . may take several hours to develop." (Mustalish Tr. at 668:5-18.)

Application of President & Dirs. of Georgetown Coll., Inc., 331 F.2d 1000, 1009 (D.C. Cir. 1964) ("[A] life hung in the balance.  There was no time for research and reflection").

(ii)     **Lack of Decisional Capacity**

Viewing the evidence in the light most favorable to Plaintiff and deferring to credibility determinations and reasonable inferences of the jury, see Galdieri-Ambrosini, 136 F.3d at 289, Defendants established at trial through expert testimony – which Plaintiff failed to counter with an expert of his own – that Mr. Green lacked the decisional capacity to refuse transport to St. Luke's for further medical evaluation and treatment while in his apartment on March 19, 2000. (See Crisari Tr. at 324:16-19; Mustalish Tr. at 687:10-12); see also Henrietta D., 331 F.3d at 275.[13]  Defendants' expert, Dr. Mustalish, opined that "any time from six minutes or more" of oxygen deprivation "would be sufficient to give injury to the brain" (Mustalish Tr. at 681:8-9) and that due to the "period of time of anoxia" that Mr. Green suffered (at least six minutes (see Reiser Tr. at 869:3-8)) "his ability to be competent to make th[e] decision" to refuse medical assistance, assuming arguendo that he had stated such a desire, "could not be validated or counted on . . . because the injury to his brain alone would alter his judgment."  (Mustalish Tr. at 670:22-671:10.)  Dr. Mustalish testified – again unrebutted by any expert for the Plaintiff – that Mr. Green and his family "could not [have been] aware of the gravity of his medical situation" while in the apartment on March 19, 2000 because "the extent of his pneumonia, the infiltrate, and the extent of his white cell infection and the failure of his antibiotics was not known by anybody until the emergency radiology test was done, x-rays were done and until the blood test was done [at St. Luke's]."  (Mustalish Tr. at 692:3-12.)

---

[13]     The Guidelines state that "a patient must demonstrate the decisional capacity to make an informed refusal before he/she can refuse medical aid."  (Pl. Ex. 14 § 4.2.)

Defendants also presented unrebutted testimony from Dr. Reiser, the physician who evaluated Mr. Green at St. Luke's, that the EMTs had reported that Mr. Green had been hypoxic for six minutes, that he was treated for hypoxia with 100% oxygen for several hours while in the emergency room at St. Luke's, and that Dr. Reiser believed Mr. Green's "blood gas readings" demonstrated hypoxia.  (See Reiser Tr. at 869:3-8, 890:23-891:13.)  And when, after Mr. Green had received mechanical ventilation and 100% oxygen for several hours, Dr. Reiser made Mr. Green aware of his precarious medical condition, Mr. Green consented to remain at St. Luke's for further treatment – and then consented again to admission at Columbia Presbyterian Hospital for additional treatment – despite all of his family's earlier protestations against hospital evaluation and treatment aimed at the City and Lieutenant Giblin on March 19, 2000.  (See Reiser Tr. at 866:6-13.)

Similarly, Lieutenant Giblin testified at trial that, while in the Greens' apartment, he believed that Mr. Green had developed hypoxia.  (See Giblin Tr. at 382:10-13, 383:4-6 ("Q: Why do you say that, he was probably hypoxic?  A: Because once his ventilator [stopped], unless someone started to bag him, hypoxia would go to his brain").)  The Guidelines state that a person "is lacking the capacity to make an informed decision," if he is, among other things, "impaired by hypoxia."  (Pl. Ex. 14 § 3.5.5.)[14]  Lieutenant Giblin testified that he believed Mr. Green "did not have [decisional] capacity" throughout the period of time that Lieutenant Giblin was in the Greens' apartment.  (Giblin Tr. at 377:6-13, 378:14-15.)

At trial, Plaintiff offered no expert witness or other medical testimony to show that Mr. Green had the decisional capacity to refuse medical assistance on March 19, 2000.  Rather,

---

[14]   "Impaired by sepsis" is also listed in the Guidelines as a condition which indicates a lack of decisional capacity.  (See Pl. Ex. 14 § 3.5.7.)  Mr. Green was also reported to have "sepsis," or blood poisoning (see Mustalish Tr. at 656:9-22) by the paramedic at the Greens' apartment who described Mr. Green as "septic" during the call to Telemetry.  (Pl. Ex. 27 at 21.)

Plaintiff relied upon the testimony of the Green family (and Joan Bertin), as to their impressions of Mr. Green's decisional capacity during the events of March 19, 2000.  Plaintiff's witnesses are not medical professionals and their testimony regarding whether Mr. Green had decisional capacity to refuse treatment or whether it was medically prudent to attempt to keep and treat Mr. Green at home was not, and no reasonable jury could find that it was, based upon appropriate evaluation of "relevant medical standards."  Olivier, 398 F.3d at 190.[15]

Plaintiff's case must fail and the judgment against the City and Lieutenant Giblin must be reversed – **if for no other reason** – because Plaintiff offered no expert to counter Defendants' expert witness, Dr. Mustalish, who opined that Mr. Green lacked decisional capacity because of hypoxia.  "[A] jury composed of non-experts typically cannot discern generally accepted medical standards," such as when a person in Mr. Green's circumstances, suffering from the effects of oxygen deprivation and a number of other life-threatening conditions, lacks the decisional capacity to refuse medical treatment.  Olivier, 398 F.3d at 190.  In Olivier, the Court of Appeals for the Second Circuit reversed the district court's denial of the defendants' motion for a post-trial judgment as a matter of law, stating that because the plaintiff "did not introduce expert testimony as to medical standards, there was no legally sufficient evidentiary basis for a reasonable jury to find for [the plaintiff]."  398 F.3d at 190-91.[16]

---

[15]     Moreover, as noted, the undisputed testimony is that, after receiving several hours of pure oxygen at St. Luke's, Mr. Green consented to hospitalization and treatment, having learned about his precarious condition from Dr. Reiser.  (See Reiser Tr. at 866:6-13; see also n.7, supra.)

[16]     Plaintiff argued at trial that Mr. Green's decisional capacity was reflected in a call report prepared by the paramedics on-scene on March 19, 2000, which indicated that Mr. Green's Glasgow Coma Scale ("GCS") grade increased from a 3 out of a possible 15 at 2:57 p.m., when the EMTs and paramedics first arrived, to a 15 out of 15 at 3:20 p.m., shortly before Lieutenant Giblin arrived on the scene.  (See Pl. Ex. 13.)  Plaintiff also entered into evidence a call report prepared by the EMTs which showed that at 3:20 p.m., Mr. Green had a GCS grade of 12 out of 15.  (See Pl. Ex. 12; Giblin Tr. at 409:24-410:4.)  Dr. Mustalish explained that the GCS "does not reflect whether or not the patient can think or integrate complex data or make any kind of

### (iii)    Telemetry

No reasonable jury, viewing the evidence in the light most favorable to Plaintiff and crediting credibility determinations and reasonable inferences drawn by the jury, could have determined that Telemetry officials discriminated against Mr. Green (or caused Mr. Green to be discriminated against).  Among other reasons, Telemetry determined only that a supervisor was needed on the scene (i.e., Lieutenant Giblin) to make the decision as to any refusal of medical assistance or removal, after gathering more information at the Greens' apartment.  (See Crisari Tr. at 320:6-11.)  A paramedic at the Greens' apartment contacted Telemetry at 3:14 p.m. on March 19, 2000 (Pl. Ex. 11), and informed Telemetry that Mr. Green had been "unconscious," had "a history of Lou Gehrig's disease," that his respirators had failed, that he was being ventilated via ambu-bag, that he had "about 100ccs of yellow green mucous" removed from his lungs, and that he was "septic."  (Pl. Ex. 27 at 21, 23.)  The Telemetry officials also learned that Mr. Green's "family does not wish to allow him to be removed from the residence."  (Pl. Ex. 27 at 21.)  Telemetry treated the situation as "a potential refusal of medical aid" in which the paramedics "needed more help on the scene for extenuating circumstances."  (Crisari Tr. at 330:21-23.)

Based upon the information provided, the medical officials at Telemetry made the (non-discriminatory) decision at 3:18 p.m. on March 19, 2000 to send a supervisor, Lieutenant Giblin, to the scene to "assess the scene again, assess the patient, and make a decision [whether] a

---

decisions.  It is just a gross response to stimulation."  (Mustalish Tr. at 649:23-25, 650:8-13.)  Dr. Mustalish also testified that a grade of 3 on the GCS "means totally unresponsive to any kind of stimulation" and indicates "the deepest coma you can be in.  In fact, a dead person has a 3."  (Mustalish Tr. at 648:24-25, 649:8-9.)

refusal of medical aid [is] appropriate or is transport [to the hospital] necessary."[17]  (Crisari Tr. at 320:6-11.)  Dr. Flavio Crisari, the physician on staff at Telemetry on March 19, 2000, testified at trial that he directed that a "higher medical authority" report to the scene because "there were other circumstances that made [the Telemetry paramedic] feel comfortable to have a backup as I did, due to the condition of the patient at that time."  (Crisari Tr. at 331:25-332:2.)

### (iv)  Causation

Viewing the evidence in the light most favorable to Plaintiff and crediting credibility determinations and reasonable inferences drawn by the jury, Plaintiff failed to prove that any of the events which transpired on March 19, 2000, particularly Mr. Green's removal to St. Luke's about which the Greens complain, caused injury.[18]  Plaintiff introduced two undated (close-up) photographs of sores previously taken in September and October of 2000 (which Alixandra Green testified she recognized as having been on "my father's back").  (A. Green Tr. at 273:16-17; see Pl. Ex. 18B, 18C; S. Green Tr. at 729:13-23, 730:24.)  Dr. Innocencia Carrano, a physical medicine specialist who treated Mr. Green's sores and who was called as Plaintiff's own witness, testified that when she first treated Mr. Green on January 26, 2001, more than ten months after the incident in question, the Green family "said that [the sores] were six months old" (Dr. Innocencia Carrano Trial Testimony, July 9, 2007 ("Carrano Tr."), at 97:4-5, 114:15-22) – which meant they had occurred in late July of 2000 or more than four months after the events of March 19, 2000.  Mr. Green's records from his (consensual) admission at St. Luke's Roosevelt and

---

[17]      (See n.16, supra, which indicates that at 3:18 p.m., no change in Mr. Green's GCS scale had yet been reflected in the call reports; see also Pl. Ex. 12, 13.)

[18]      Plaintiff's position was that his injuries arose, if at all, from the actions of Defendants in removing Mr. Green from his apartment.  (See W. Green Tr. at 486:1-6 ("Q: Could you describe how you were injured on March 19, 2000?  A: Being transferred, bumped downstairs, tilted uncomfortably in elevator, transferred again and lying for ten on hard flat emergency room bed").)

Columbia Presbyterian Hospital for the six days after March 19, 2000, which reflect twice-daily evaluations of Mr. Green's skin, indicate that his skin showed no signs of injury. (See Def. Ex. C, D.) Based upon those same records, among other things, the expert opinion of Dr. John Hunter, a plastic surgeon called by the defense, was that "there is absolutely no evidence" that Mr. Green suffered shearing injuries "anywhere on his body" on March 19, 2000 and "there is not any possible causal relationship" between the events of March 19, 2000 and any sores Mr. Green may have developed. (Dr. John Hunter Trial Testimony, July 11, 2007, at 586:13-587:3, 587:15-588:3.)

As evidence of Mr. Green's alleged emotional injuries, Plaintiff presented testimony from Alixandra Green, Joan Bertin, and Mr. Green's respiratory therapist, William Hill, that, after the (life-threatening) events of March 19, 2000, Mr. Green was "depressed," "less enthusiastic about living every day," "more subdued and withdrawn for a period of time," and "still angry about what happened." (A. Green Tr. at 264:12; Bertin Tr. at 178:2-3; Hill Tr. at 64:8-9.) Plaintiff also presented Mr. Green's narrative deposition response (which was prepared prior to his deposition and) presented to the jury by videotape. (See W. Green Tr. at 742:18-743:16; Pl. Ex. 30.) But Plaintiff presented no medical evidence or testimony that Mr. Green sought or received any medical or psychological assistance for his alleged emotional injuries. See New York City Transit Auth. v. State Div. of Human Rights, 78 N.Y.2d 207, 217, 577 N.E.2d 40, 41 (1991) ("there must be some evidence of the magnitude of the injury"). And, Dr. Mustalish testified that "anoxia or lack of oxygen to the brain damages the brain and injures the brain," and "[p]atients who sustain brain injury will have change[s] in behavior, levels of depression." (Mustalish Tr. at 671:21-672:10); see Meacham, 381 F.3d at 78 ("[m]ental anguish damages must also be 'reasonably related to the discriminatory conduct' of the defendant").

The cause of injury to Mr. Green, if any, was Lieutenant Giblin's decision to take Mr. Green to St. Luke's for evaluation and treatment over his family's protests – which the jury found to be a reasonable decision (see n.5, supra).  See Warrick, 299 A.D.2d at 623 (finding no liability under an ADA or HRL claim where there was "no legal connection between the alleged violations and the injuries sustained by plaintiff"); see also Sundance Cruises Corp. v. Am. Bureau of Shipping, 799 F. Supp. 363, 391 (S.D.N.Y. 1992) ("where the employee's act that caused the alleged injury was found to be 'lawful' . . . the employer was therefore not liable under the doctrine of respondeat superior").

**Motion for a New Trial**

The Court is constrained to "also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the new trial."  Fed. R. Civ. P. 50(c)(1).  And, while the Court believes that Defendants clearly are entitled to judgment as a matter of law pursuant to Rule 50(b), in the event the Court's judgment as a matter of law is vacated or reversed, a new trial should be held to correct the (seriously erroneous result and) gross miscarriage of justice by the jury in finding the City liable for ADA and HRL violations.  That aspect of the jury verdict was (overwhelmingly) against the weight of the credible evidence (and the law).  See DLC Mgmt. Corp., 163 F.3d at 133.

Having observed witness demeanor at trial, the Court finds that the City's witnesses were more objective, professional, and knowledgeable than the Plaintiff's witnesses – and, more credible.  The Court, in particular, found the following evidence to be credible and persuasive:

- The testimony by Lieutenant Giblin that, based on what he learned upon arriving at the Greens' apartment, he concluded that Mr. Green was suffering from the effects of hypoxia and was not alert and oriented to person, place, and time, and, for these reasons,

that he did not evaluate Mr. Green for a refusal of medical assistance (see Giblin Tr. at 383:1-6, 383:12-13, 435:24-436:1);

- Lieutenant Giblin's testimony that had he spoken with Mr. Green, it would not "have made any difference" regarding Lieutenant Giblin's decision to transport Mr. Green to a hospital for evaluation and treatment because Mr. Green was "in extremis" and "there was no medical authority for me to leave him there with" (Giblin Tr. at 377:11-13, 437:5-11);

- The testimony of Dr. Mustalish that Mr. Green lacked decisional capacity to refuse medical assistance while in his apartment due to "his period of time of anoxia, although resuscitated and he was alert, his ability to be competent to make that decision could not be validated or counted on" (Mustalish Tr. at 670:17-671:1);

- The (deposition) testimony of Dr. Tiffany Reiser that after Mr. Green had been placed on a respirator and given 100% oxygen for several hours at St. Luke's emergency room, had blood drawn and x-rays taken, and after she informed Mr. Green of his problematic medical condition and test results, "he agreed" (consented) to be admitted to St. Luke's for two days, and thereafter to Columbia Presbyterian for five days (see Reiser Tr. at 866:6-13), which flatly contradicted the earlier, vigorous opposition of the Green family and Joan Bertin to Plaintiff's removal and hospitalization;

- Dr. Mustalish's testimony that, had Mr. Green not been taken to St. Luke's, it was "[m]ore likely than not he would have had another respiratory arrest which in the middle of the night or some other time would not have been so successful, that he would have died" (Mustalish Tr. at 673:6-9);

- Dr. Mustalish's testimony that "the decision to transport Mr. Green to the hospital met the standard of good and acceptable practice of emergency medicine" (Mustalish Tr. at 672:17-19);

- The notations in the call reports prepared by the EMTs and paramedics, reflecting that Mr. Green was in a deep coma with a GCS grade of 3 when they arrived and was not responsive to stimuli for more than half an hour (see Pl. Ex. 11, 12, 13); and

- The entry on the computer dispatch report that the Green family was "refusing to let [patient] who is being bagged to leave the house" at 3:09 p.m., approximately eleven minutes before Mr. Green regained consciousness.  (Pl. Ex. 11 at 1; see Pl. Ex. 12.)

In contrast, the testimony of Plaintiff's witnesses reflected more bias and emotion than relevant medical facts, including, for example, Susan Green's statement, "[n]o, I did not think this was really an emergency" (S. Green Tr. at 736:3-4); and Joan Bertin's comment that "I thought . . . that my only recourse was publicity." (Bertin Tr. at 209:3-7.) Another example of Plaintiff's testimony which the Court did not find credible was the statement that, after arriving at St. Luke's, Mr. Green agreed to be admitted and remain hospitalized for seven days, not because of his hypoxia or his pneumonia but "because he was taken out of his wheelchair [and] we didn't have the means to get him home" and "we also would need to have called Access-A-Ride in advance to have them pick us up." (A. Green Tr. at 261:16-24.)

**Remittitur**

The City argues that, in the alternative to a judgment as a matter of law or a new trial as to liability, "a new trial should be granted" as to damages or "the Court should significantly reduce the jury award of $400,000 in compensatory damages because it is excessive and is a miscarriage of justice." (Def. Mem. at 15-16.) Plaintiff responds that the jury's award is appropriate because "[e]xtensive evidence was adduced by plaintiff that Walter suffered excruciating physical pain" and "exquisite emotional distress as a result of his treatment by the defendants." (Pl. Mem. at 11.)

While it may be tempting to suggest a remittitur because this case has been protracted and because the award of $400,000 in compensatory damages "shock[s] the judicial conscience" Casey, 406 F.3d at 147, and deviates "materially from what would be reasonable compensation," Meacham, 381 F.3d at 78, given the facts adduced at trial, the Court concludes that it would not be appropriate to permit a finding of liability against the City to stand for the reasons stated above and, therefore, the Court does **not** recommend either a new damages trial or remittitur. See Ramirez v. New York City Off-Track Betting Corp., 112 F.3d 38, 40 (2d Cir. 1997) (if "the

record establishes that the jury's verdict on damages was not only excessive but was also infected by fundamental error, remittitur is improper").[19]

## IV.   Conclusion

For the reasons stated herein, the Court grants the City's motion for judgment as a matter of law pursuant to Rule 50(b).  If the judgment is vacated or reversed on appeal, the Court, alternatively, grants the City's motion for a new trial on Plaintiff's ADA and HRL claims pursuant to Fed. R. Civ. P. 50(c) and 59(a).[20]

The Clerk of Court is respectfully requested to enter judgment in favor of the City of New York and Lieutenant Paul Giblin and to close this case.

Dated: New York, New York
       September 6, 2007

_RMB_

**RICHARD M. BERMAN, U.S.D.J.**

---

[19]     Assuming, <u>arguendo</u>, the Court were to grant a remittitur, only nominal damages would be appropriate.  <u>See</u> <u>Scala v. McCormack Lines, Inc.</u>, 985 F.2d 680, 684 (2d Cir. 1993).

[20]     The jury's determinations in favor of Defendants as reflected in the verdict sheet are compelled by the evidence adduced at trial and are not challenged by Plaintiff.